People of the State of Illinois, Appellee, v. LaCarttle Jones (Alias) Carter Jones, Defendant-Appellant.

Gen. No. 68–36.

Fifth District.

June 25, 1970.

Russell H. Classen, of Belleville, for appellant.

Robert H. Rice, State's Attorney of St. Clair County, of Belleville (William B. Starnes, Assistant State's Attorney, of counsel), for appellee.

EBERSPACHER, J.

Appeal from conviction of murder and armed robbery in the Circuit Court of St. Clair County. A jury rendered a verdict against the defendant, LaCarttle Jones, finding him guilty of murder and armed robbery. The court imposed a sentence of 199 to 200 years on the murder charge and 50 to 75 years on the armed robbery, the sentences to run concurrently.

The State produced the following evidence:

Soon after midnight on July 30, 1966, defendant and one later identified as John Patterson walked into the Skylark Liquor Store in East St. Louis operated by Mr. and Mrs. Skrabacz. Defendant produced a .45-calibre automatic and Patterson a revolver, and the two of them proceeded to rob the Skrabaczs of $190.

The silent alarm was sounded by a signal to the American District Telegraph office. The agent at the A. D. T. office notified the police. A police car about 3 blocks away from the scene at the time responded to the call. Two officers, Patrolman Gene Rittenhouse and Sgt. Frederick Hudson arrived in a police car. One of the two holdup men, allegedly LaCarttle Jones, was coming out of the store with Mr. and Mrs. Skrabacz in front of him at gunpoint when the officers arrived. The other holdup man was trailing behind. Sgt. Hudson and Patrolman Rittenhouse then got out of the car and proceeded

towards the two, who by that time had seen the police officers.

As the police approached the holdup men, they began to flee. One of the men was wearing a red shirt and the State's evidence is that LaCarttle Jones, wearing a red shirt, turned and fired a shot in the direction of the policemen. They proceeded into a passageway and a gun battle ensued. Patterson, the other holdup man, had already fled. The State's evidence is that Jones engaged in the gun duel with the police officers and Sgt. Hudson was fatally wounded and died of the wounds he received. The other officer received a gunshot wound in a foot.

Defendant was apprehended some 10 to 20 minutes later not far from the scene of the holdup. He had suffered a gunshot wound and was taken to a hospital. The next morning a .45-calibre pistol was found under a shrub by the house where a man was seen to fall or stumble by a lady who lived in the neighborhood. While at the hospital, the defendant was identified by the two victims of the holdup as well as by a young man who was in the liquor store at the time. A tavern store owner by the name of Ben Stewart in the City of St. Louis had been held up five days prior to this robbery and his testimony was that one of the things taken in his holdup by this defendant was the same .45-calibre automatic pistol.

The defendant Jones testified and denied that he was ever in the Skylark Liquor Store. In regard to his wound, his testimony was that he was shot by accident while going through the passageway.

The defendant was brought to trial charged with three counts: (1) the murder of Frederick D. Hudson; (2) the armed robbery of Leo Skrabacz of the sum of $190; and (3) murder while committing the forcible felony of armed robbery in that he shot and killed one Frederick D. Hudson without justification. The jury had

been qualified to recommend capital punishment but did not so recommend.

Before the jury was called and examined on voir dire, in response to the State's Attorney requesting that the jury be qualified on the question of capital punishment, the court remarked:

> "It seems to be pretty easy around here to do. Your last one we tried came in in about 25 minutes to recommend the death penalty. We had very, very few jurors that had any conscientious scruples against the imposition of the death penalty in a proper case."

Defense counsel, upon being advised that jurors who opposed the death penalty would be excused for cause, objected.

The jury was called and the court advised them of the nature of the charges and the procedure to be followed which included the following:

> "You will be qualified in this case for the death penalty, but before I begin my interrogation of the jurors, I want to explain to you the law in regard to the death penalty. In bringing in a verdict, if you find the defendant guilty of murder, you may or may not recommend the death penalty, and if you do not recommend the death penalty, I cannot impose it, but if you do recommend the death penalty, I may or may not impose the death penalty. That is my responsibility. Quite frequently a trial judge does not impose the death penalty, even though the jury recommends it. On the other hand, frequently a trial judge does impose the death penalty if it is recommended by the jury. If there are any questions about that, please feel free to ask me any questions you might care to while I am interrogating you on your qualifications. The first lady, what is your name?"

172

All prospective jurors were asked, "Do you have any conscientious scruples against the imposition of the death penalty in a proper case?" Upon answering "Yes" to that question, 9 were excused for cause. In addition, several of the jurors were asked "Do you feel you could recommend the death penalty here if you felt it was a proper case for it?" and answered "Yes." One panel of four each responded "Yes" to the State's Attorney's question, "You are aware of the fact also that this jury that is being qualified for the death penalty that it is up to you to determine this after having heard all the evidence, (1) is the defendant Mr. Jones guilty; (2) whether or not you want to recommend the death penalty; you understand that is your function in the case?"

The defendant urges that the court erred in the following particulars: in excusing the tentative jurors and members of the voir dire panel for reasons of having conscientious scruples against recommending the death penalty; in making comments to the jury prejudicial to the defendant; in allowing the witness Ben Stewart to testify concerning a prior robbery by the defendant; and in receiving into evidence records of the defendant's prior convictions for armed robbery in Arkansas and Tennessee. Each contention of the defendant shall be considered in order.

██ The defendant asserts that by qualifying the jury for capital punishment that the defendant is thereby denied his right to a fair trial as guaranteed under his constitutional rights. The defendant relies heavily upon the case of Witherspoon v. Illinois, 391 US 510, 20 L Ed 2d 776, 88 S Ct 1770 (1968). The Witherspoon case involved a murder conviction wherein the jury had been "qualified" to return a capital punishment recommendation and the sentence was death. In that case the court proceeded to exclude numerous veniremen because of their attitudes about the death penalty. In fact, only a few of the number excluded had stated they would under

173

no circumstances vote to impose capital punishment. The Supreme Court determined that the tone of the trial was such that the "deck was stacked" against the defendant for the punishment to be returned if the verdict was to be found adverse to the defendant. The Court did not consider and it specifically stated that the issue of guilt or innocence was not before the court. "The issue before us is a narrow one. It does not involve the right of the prosecution to challenge for cause those prospective jurors who would state that their reservations about capital punishment would prevent them from making an impartial decision as to the defendant's guilt." Thus, Witherspoon doctrine does not apply to the present case wherein there was no recommendation of capital punishment. The issue of the defendant's guilt was not disturbed by the Supreme Court in the Witherspoon case and there is no reason to disturb the issue of guilt in the present case. People v. Speck, 41 Ill2d 177, 242 NE2d 208 (1968) ; People v. Cesarz, 44 Ill2d 180, 255 NE2d 1 (1969).

See also Bumper v. State of North Carolina, 291 US 543, 88 S Ct 1788, where the Supreme Court said:

"Our decision in Witherspoon does not govern the present case, because here the jury recommended a sentence of life imprisonment. The petitioner argues, however, that a jury qualified under such standards must necessarily be biased as well with respect to a defendant's guilt, and that his conviction must accordingly be reversed because of the denial of his right under the Sixth and Fourteenth Amendments to trial by an impartial jury . . . . We cannot accept that contention in the present case. The petitioner adduced no evidence to support the claim that a jury selected as this one was is necessarily "prosecution prone," and the materials referred to in his brief are no more substantial than those

174

brought to our attention in Witherspoon. Accordingly, we decline to reverse the judgment of conviction upon this basis." (Citations and references to footnotes omitted.)

■ The defendant further argues that the jury by returning the verdict of guilty thought that they would be allowing the trial judge to impose the death penalty. This contention is without merit as the court advised the jury "in bringing in a verdict, if you find the defendant guilty of murder, you may or may not recommend the death penalty, *and if you do not recommend the death penalty, I cannot impose it,* but if you do recommend the death penalty I may or may not impose the death penalty." (Italics ours.)

■ That the jury did not recommend the death penalty in this case where the evidence of guilt is quite clear and the defendant's testimony begs credibility gives strong support for the contention that the defendant received a clean "deck" from the jury. Witherspoon v. Illinois, supra.

■ The defendant's next assertion is that because the court asked initially from the individual venireman "Do you have any conscientious scruples against the imposition of the death penalty in a proper case?" and that the court inquired, again individually, of many of the veniremen "Do you feel you could recommend the death penalty here if you felt it was a proper case for it?," prejudiced the jury on the question of guilt. As stated in People v. Speck, supra, "We must look at the atmosphere of the proceedings." A review of the record indicates as in Speck that "the tone of the proceedings here indicated a sincere desire on the part of the prosecutor and the court to determine the jurors' qualifications according to the standard later held acceptable in Witherspoon." The court must make inquiries of prospective veniremen and the record does not support the defend-

ant's contention that the judge's questions and comments were prejudicial to the defendant under the law as stated in the above cited decisions which are binding on this Court. There is no indication that the questions were asked to hasten impaneling the jury.

■■ Defendant contends he was prejudiced by the argument of the State's Attorney in which defendant was referred to as "a twice convicted fellow" and a "convicted stickup man." As we later point out in consideration of defendant's fourth contention, there was properly before the jury evidence attacking the credibility of defendant consisting of two prior convictions for armed robbery. Defendant complains of, but does not deny that the appellations were correct ones. A prosecutor may denounce the accused's testimony if he relies on the evidence. People v. Sinclair, 27 Ill2d 505, 190 NE2d 298. In People v. Allen, 73 Ill App2d 256, 219 NE2d 653, the Court held that the statement of a prosecutor that the defendant was, in his opinion, a thief, was not error where the evidence clearly showed that defendant was a thief. Defendant will not be heard to complain of appellations which truly characterize him as shown by the evidence.

■ The defendant next asserts that the court erred in receiving testimony from Ben Stewart, owner of a liquor store in St. Louis. Ben Stewart had been robbed 5 days before the present robbery and murder, and among other things taken was a .45-calibre pistol. He testified that the gun that the police had found near the scene of this crime was his and that the man that had taken the gun from him was the present defendant. The court permitted Stewart to testify and it was correct in so doing to show where the defendant acquired the weapon; not for the purpose of showing that the defendant may or may not have been involved in a previous armed robbery. People v. April, 97 Ill App2d 1, 239 NE2d 285 (1968).

176

The Court in People v. Ostrand, 35 Ill2d 520, 221 NE2d 499, stated:

"While it is true that proof of the commission of a separate offense unrelated to the crime charged ordinarily should not be received, if such evidence tends to prove the offense charged it may be admitted notwithstanding the disclosure of other crimes involving the defendant (cases cited). Here, the testimony of Posdal was relevant as tending to prove that defendant had acquired from him the same weapon which formed the basis of the charge."

In the present cause, the testimony was necessary not only to show that the defendant had acquired the weapon but also that the defendant was connected to the gun found near the scene of the crime. Ben Stewart's testimony was proper.

■ As his final contention, the defendant urges the court erred in receiving into evidence records of defendant's prior convictions for armed robbery. The defendant did not answer when asked by the State's Attorney whether he had been convicted of previous crimes. The admission of the records of prior infamous crimes to show the defendant's credibility when the defendant has failed to answer is correct. People v. Squires, 27 Ill2d 518, 190 NE2d 361, cert den 375 US 978, 11 L Ed2d 422, 84 S Ct 498.

There is no reversible error and the case is affirmed. We appreciate the diligence and thoroughness of appointed counsel.

Judgment affirmed.

GOLDENHERSH and MORAN, JJ., concur.